No. 12-2357

In the United States Court of Appeals
for the Fourth Circuit

_____

DIANE RUSSELL,
*Plaintiff-Appellee*,

v.

ABSOLUTE COLLECTION SERVICE INC.,
*Defendant-Appellant.*
_____

On Appeal from the United States District Court
for the Middle District of North Carolina at Greensboro

_____

**BRIEF FOR APPELLEE DIANE RUSSELL**

_____

Joanne Faulkner                    Suzanne R. Begnoche
123 Avon Street                    312 West Franklin Street
New Haven, CT                      Chapel Hill, NC 27516
(203) 772-0395                     (919) 960-6108

Deepak Gupta
Gupta Beck PLLC
1625 Massachusetts Avenue, NW
Washington, DC 20036
(202) 470-3826

*Counsel for Plaintiff-Appellee Diane Russell*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of all parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case.  In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form.  Counsel has a continuing duty to update this information.

No.  12-2357          Caption:  Diane Russell v. Absolute Collection Service, Inc.

Pursuant to FRAP 26.1 and Local Rule 26.1,

Diane Russell
(name of party/amicus)


who is _____ Appellee _____, makes the following disclosure:
        (appellant/appellee/amicus)


1.      Is party/amicus a publicly held corporation or other publicly held entity?   ☐ YES ☑ NO


2.      Does party/amicus have any parent corporations?                    ☐ YES ☑ NO
        If yes, identify all parent corporations, including grandparent and great-grandparent corporations:




3.      Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                          ☐ YES ☑ NO
        If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?    ☐ YES ☑ NO
If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    ☐ YES ☑ NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?    ☐ YES ☑ NO
If yes, identify any trustee and the members of any creditors' committee:

Signature: _/s/ Suzanne R. Begnoche_____    Date: _____7/15/13_____

Counsel for: Diane Russell_____

# CERTIFICATE OF SERVICE
**************************

I certify that on _____July 15, 2013_____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

_/s/ Suzanne R. Begnoche_____                    _____7/15/13_____
(signature)                                                      (date)

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................... iii

INTRODUCTION ................................................................................... 1

STATEMENT OF THE ISSUES ............................................................. 3

STATEMENT OF CASE AND FACTS .................................................. 4

    A.    Statutory and Regulatory Background ................................... 4

    B.    Facts ...................................................................................... 6

    C.    Proceedings Below ................................................................ 9

    D.    The Excluded Evidence ....................................................... 16

SUMMARY OF ARGUMENT ............................................................. 19

STANDARD OF REVIEW .................................................................. 21

ARGUMENT ....................................................................................... 22

    I.    THE DISTRICT COURT WAS CORRECT AS A MATTER OF LAW TO DENY A DIRECTED VERDICT TO ACS. ..................... 22

        A.    A reasonable jury could only have found in Ms. Russell's favor at the close of her evidence at trial ............................................ 22

        B.    A consumer's failure to dispute a valid debt does not excuse the debt collector's subsequent false statements and threats. ... 24

    II.    THE DISTRICT COURT WAS CORRECT AS A MATTER OF LAW IN GRANTING A DIRECTED VERDICT TO MS. RUSSELL ON HER FDCPA CLAIMS .......................................................... 27

i

A.    A reasonable jury could only have found in Ms. Russell's favor at the conclusion of evidence at trial.........................................27

B.    ACS made no effort to avoid falsely claiming Ms. Russell owed money or to avoid wrongfully threatening to report the paid-off bill to the credit bureaus as delinquent......................................30

III.    THE TRIAL COURT DID NOT ERR IN ITS EVIDENTIARY RULINGS............................................................................................35

A.    ACS did not comply with Rule 26(a) and (e) in that it knew of the existence of the bulk of the evidence in question from the time it received Ms. Russell's first set of discovery requests in 2009, yet it failed to disclose the evidence's existence until February 2011..............................................................................36

B.    ACS's failure to disclose the excluded evidence sooner was neither substantially justified nor harmless. ...............................40

C.    The motion in limine complied with applicable local rules.....42

IV.    THE TRIAL COURT DID NOT ERR IN DENYING THE  POST-TRIAL MOTIONS................................................................................43

CONCLUSION...................................................................................44

CERTIFICATE OF COMPLIANCE .........................................................45

CERTIFICATE OF FILING AND SERVICE..........................................46

# TABLE OF AUTHORITIES

## Cases

*Aikens v. Ingram*, 652 F.3d 496 (4th Cir. 2011) ........................................................ 22

*Brady v. Credit Recovery Co.*, 160 F.3d 64 (1st Cir. 1998) ...................................... 25

*Camacho v. Bridgeport Fin., Inc.*, 430 F.3d 1078 (9th Cir. 2005) ............................ 25

*College Loan Corp. v. SLM Corp.*, 396 F.3d 588 (4th Cir. 2005) ............................ 21

*Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639 (4th Cir. 2002) .......... 21

*Edwards v. Niagara Credit Solutions, Inc.*, 584 F.3d 1350 (11th Cir. 2009) ............ 31

*Fox v. Citicorp Credit Services, Inc.*, 15 F.3d 1507 (9th Cir. 1994) ......................... 34

*Gigli v. Palisades Collection, L.L.C.*, 2008 WL 3853295 (M.D. Pa. Aug. 14, 2008) 25

*Grant-Fletcher v. Brachfeld Law Group, PC.*, 2012 WL 2523094 (D. Md. June 28, 2012) ...................................................................................................................... 25

*Isham v. Gurstel, Staloch & Chargo, P.A.*, 738 F. Supp. 2d 986 (D. Ariz. 2010) .... 34

*Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*, 559 U.S. 573, 130 S. Ct. 1605 (2010) ...................................................................................................... 27, 33

*Keller v. Prince George's County*, 827 F.2d 952 (4th Cir. 1987) .............................. 21

*Lone Star Steakhouse & Saloon, Inc. v. Alpha of Virginia, Inc.*, 43 F.3d 922 (4th Cir. 1995) ................................................................................................................ 21

*Martinez v. Albuquerque Collection Services, Inc.*, 867 F. Supp. 1495 (D.N.M. 1994) ...................................................................................................................... 35

*McCollough v. Johnson, Rodenburg & Lauinger, LLC*, 637 F.3d 939 (9th Cir. 2011) ...................................................................................................................... 34

*Nelson v. Select Financial Services, Inc.*, 430 F. Supp. 2d 455 (E.D. Pa. 2006) ...... 24

*Owen v. I.C. Sys., Inc.*, 629 F.3d 1263 (11th Cir. 2011) ............................................ 34

*Pipiles v. Credit Bureau of Lockport, Inc.*, 886 F.2d 22 (2d Cir. 1989) .................. 31

*Reichert v. Nat'l Credit Sys., Inc.*, 531 F.3d 1002 (9th Cir. 2008) ........................... 31

*Rivera v. Bank One*, 145 F.R.D. 614 (D.P.R. 1993) .................................................. 26

*Southern States Rack and Fixture, Inc. v. Sherwin Williams Co.*, 318 F.3d 592 (4th Cir. 2003) .................................................................................. 40, 41, 42

*Turner v. J.V.D.B. & Associates, Inc.*, 318 F. Supp. 2d 681 (N.D. Ill. 2004) .......... 34

*United States v. Cone*, 714 F.3d 197 (4th Cir. 2013). ............................................... 21

*United States v. Johnson*, 587 F.3d 625 (4th Cir. 2009) ........................................... 21

*Warren v. Sessoms & Rogers, P.A.*, 676 F.3d 365 (4th Cir. 2012) ............................ 5

## Statutes

15 U.S.C. § 1692(e) ...................................................................................................... 4

15 U.S.C. § 1692e ........................................................................................ 3, 4, 9, 24

15 U.S.C. § 1692e(10) ................................................................................................ 28

15 U.S.C. § 1692e(2)(A) ............................................................................. 4, 9, 19, 28

15 U.S.C. § 1692e(5) .................................................................................................. 19

15 U.S.C. § 1692e(8) .................................................................................. 5, 9, 19, 29

15 U.S.C. § 1692f ..................................................................................................... 5, 9

15 U.S.C. § 1692g(a)(3) ............................................................................................. 24

15 U.S.C. § 1692k(c) ................................................................................ 3, 6, 20, 30

N.C.G.S. § 58-70-90 ..................................................................................................... 9

N.C.G.S. § 58-70-95 ................................................................................................... 29

N.C.G.S. §58-70-110 ...........................................................................29


## Rules

Fed. R. Civ. P. 26(a)(1) .....................................................................10

Fed. R. Civ. P. 26(a)(1)(A)(i) ...........................................................37

Fed. R. Civ. P. 26(a)(1)(A)(ii) ..........................................................37

Fed. R. Civ. P. 26(a)(3) ..........................................................13, 38, 39

Fed. R. Civ. P. 26(a)(3)(A)(i) ...........................................................38

Fed. R. Civ. P. 26(a)(3)(A)(ii) ..........................................................38

Fed. R. Civ. P. 26(a)(3)(B) ....................................................38, 39, 42

Fed. R. Civ. P. 26(e) ...............................................................36, 37

Fed. R. Civ. P. 26(e)(1)(A) ...............................................................38

Fed. R. Civ. P. 30(b)(6) .....................................................................14

Fed. R. Civ. P. 37(b)(2)(c) .................................................................10

Fed. R. Civ. P. 37(c)(1) ..........................................................13, 38, 40, 42

M.D.N.C. L.R. 40.1(c) .......................................................................39


## Other Authorities

Advisory Committee Notes to 1993 Amendment to Rule 26 ............................39, 43

Federal Trade Commission, Staff Letter to Cass, December 4, 1997 .....................26

Senate Report No. 95-382, 95th Cong., 1st. Sess. ...................................4, 5

## INTRODUCTION

Even after Diane Russell paid her $501 medical bill, Absolute Collection Service (ACS) repeatedly sent her escalating collection demands. After the first one, she called ACS and reported (as reflected in ACS's own records) that she had already paid and "that the check cleared her bank account."

Yet, just a few weeks later, she received another demand: "We are dismayed by your inaction with respect to our previous requests that you settle your account[.] Our records indicate that you still owe $501.00." ACS promised a phone call to find out "the reasons you are ignoring our requests for payment." Again, Ms. Russell called ACS. And, again, she reported that her bill was already paid. This time, the collection agent told her that she could set up a payment plan. The encounter left Ms. Russell in tears.

But the final straw came a month later, when ACS threatened that "[w]e will be reporting your past due account to national credit bureaus. This information will remain on your credit file for the next seven (7) years. You may be denied credit in the future as a result." Fearing that ACS would destroy her family's fragile finances, Ms. Russell complained to the Better Business Bureau. Only after it received the BBB's complaint did ACS finally confirm—in one phone call—that Ms. Russell had paid her bill in the first place. Worse still, ACS's own records revealed

1

that, between the first time Ms. Russell notified ACS of her payment and the BBB's contact several months later, ACS had done *nothing* to confirm the payment with the creditor. Its policy, it turns out, is not to call and confirm such payments because the calls would be "too time consuming."

Because ACS's conduct violated the Fair Debt Collection Practices Act, the district court correctly granted a directed verdict in Ms. Russell's favor. Taking an "everything but the kitchen sink" approach, ACS now appeals that verdict, in addition to other evidentiary and procedural rulings. But ACS's appeal is meritless. A reasonable jury, viewing the evidence in the light most favorable to ACS, could have found only that ACS made false statements in its attempts to collect money that Ms. Russell did not owe. It could have found only that ACS threatened to report her bill to the credit bureaus as past due, when it knew or should have known that was not the case. ACS makes no serious effort to deny any of this.

Although the FDCPA's bona-fide-error defense excuses unintentional errors made despite reasonable collection procedures, a reasonable jury could not have found that ACS maintained reasonable procedures. Indeed, ACS's policy of willful blindness exacerbated Ms. Russell's utterly preventable ordeal. Congress enacted the FDCPA to encourage debt collectors to adopt better procedures and avoid overzealous collection, not to hound innocent consumers with impunity.

2

## STATEMENT OF THE ISSUES

1. **Directed Verdict As to Liability.** The FDCPA prohibits debt collectors from using "any false, deceptive, or misleading representation or means in connection with the collection of any debt." 15 U.S.C. § 1692e. Was the district court correct as a matter of law to direct a verdict in favor of Ms. Russell under § 1692e because ACS falsely asserted that she owed a debt and threatened to report it to credit bureaus as "past due," even though the debt had been paid?

2. **Bona-Fide Error Defense.** Under the FDCPA's "bona fide error defense," a debt collector may escape liability if it can show, by a preponderance of the evidence, that (1) "the violation was not intentional" and (2) "resulted from a bona fide error," (3) "notwithstanding the maintenance of procedures reasonably adapted to avoid any such error." 15 U.S.C. § 1692k(c). Was the district court correct as a matter of law to direct a verdict against ACS on its bona-fide error defense where ACS had no procedures in place to prevent its false claims that the debt was owed, despite having received direct information from Ms. Russell that the payment check had cleared her bank account?

3. **Ruling on Motion in Limine**. Did the district court abuse its discretion in granting Ms. Russell's motion in limine to exclude evidence that ACS improperly failed to disclose in a timely manner?

3

**4.    Denial of Motion for New Trial and Relief from Judgment.** Did the district court abuse its discretion in denying ACS's motions for a new trial and relief from judgment?

## STATEMENT OF CASE AND FACTS

### A. Statutory and Regulatory Background

The Fair Debt Collection Practices Act (FDCPA) is the key federal statute protecting consumers from abuses by debt collectors. It ensures that "those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged." 15 U.S.C. § 1692(e). As relevant here, Congress expressly designed the FDCPA in part to "eliminate the recurring problem of debt collectors ... attempting to collect debts which the consumer has already paid." S. Rep. No. 95-382, at 4, *reprinted in* 1977 U.S.C.C.A.N. 1695.

**1. Prohibition of misrepresentation.** To this end, the Act precludes debt collectors from using "any false, deceptive, or misleading representation or means in connection with the collection of any debt." § 1692e. For example, it bans the false representation of the amount of any debt. § 1692e(2)(A). It also prohibits debt collectors from threatening to communicate credit information that they know or

should know to be false. § 1692e(8). It further bans unfair or unconscionable means of debt collection. § 1692f.

2. **Strict Liability and the Bona Fide Error Defense.** In designing the Act, Congress recognized that debt collectors have a uniquely powerful incentive to engage in abusive practices. "[I]ndependent debt collectors," Congress concluded, were "the prime source of egregious collection practices." S. Rep. No. 95-382, 95th Cong., 1st. Sess., at 2, *reprinted in* 1977 U.S.C.C.A.N. 1695, 1696. Congress was particularly sensitive to the fact that, absent federal regulation, these independent collectors would continue to have a strong incentive to profit from unscrupulous collection practices. The invisible hand of the market was an insufficient check because independent debt collectors work for their creditor-clients, not consumers. Unlike other businesses that interact with consumers, debt collectors are not "restrained by the desire to protect [consumers'] good will" or "the consumer's opinion of them." *Id.* Moreover, "[c]ollection agencies generally operate on a 50-percent commission, and this has too often created the incentive to collect by any means." *Id.*

Consequently, the FDCPA imposes strict liability "without any proof of an intentional violation" of the Act. *Warren v. Sessoms & Rogers, P.A.*, 676 F.3d 365, 375 (4th Cir. 2012) (citations omitted). A debt collector can escape liability,

however, if its specific violation was a "bona fide error" of fact. *Id.* This "bona fide error defense," codified in Section 1692k(c), requires that the debt collector show by a preponderance of the evidence that (1) "the violation was not intentional" and (2) "resulted from a bona fide error," (3) "notwithstanding the maintenance of procedures reasonably adapted to avoid any such error." *See id.* Thus, while the Act prohibits a debt collector from misrepresenting the amount of a debt, a collector may avoid liability by maintaining procedures designed to avoid making such misrepresentations.

## B. Facts

At the time of the events in this case, Absolute Collection Services, Inc. was responsible for collecting on "hundreds of thousands" of medical bills for about 750 clients nationwide. JA-643. Approximately seventy collectors made collection telephone calls to consumers all over the country in shifts from ACS's central collections floor in Raleigh, North Carolina. *Id.* ACS boasted of its "sophisticated" electronic system for automated collection management. JA-278.

Diane Russell was a retired postal worker residing in rural North Carolina with her husband and her granddaughter, whom she was raising as her own. JA-404. Maintaining a good credit rating had always been important to Ms. Russell.

JA-404-05. In recent years, her husband, Jerry, suffered several serious illnesses, including cancer, and Ms. Russell, in charge of the family finances, managed to pay all of his medical bills. JA-411.

In 2008, Jerry broke his ankle, incurring bills for emergency room treatment. JA-412. Ms. Russell applied for financial aid through the hospital to pay these bills, including one from Sandhills Emergency Physicians. JA-395-96. In mid-December 2008, however, ACS sent its standard initial form letter to Ms. Russell on behalf of Sandhills for a balance of $501 owing for Jerry's treatment. JA-636-37. The form letter stated that Sandhills "authorized us to extend to you a courtesy which allows you thirty (30) days in order to pay the balance on your account and prevent further, more serious collection activity." JA-836. Accordingly, Ms. Russell took money out of her retirement account and paid Sandhills by mailing a $501 check, dated December 28, 2008, directly to the doctor's office. JA-422-23, 425.

On February 6, 2009, ACS called Ms. Russell seeking to collect on the Sandhills bill. Ms. Russell reported, as documented in ACS's internal records for that date, that she had already "paid $501 by check; Debtor states that the check cleared her bank account." JA-835. The telephone collection agent did not ask Ms. Russell for any proof of her payment. JA-435.

Yet, on February 25, 2009, ACS sent Ms. Russell another letter, warning, "We are dismayed by your inaction with respect to our previous requests that you settle your account with Sandhills Emergency Physicians. Our records indicate that you still owe $501.00 for services that were rendered to you." JA-831. The letter promised a call to find out "the reasons you are ignoring our requests for payment." *Id.* After receiving the new collection letter, Ms. Russell called ACS on February 27 and again reported that she had paid the bill. JA-442. Upon her second report of payment, the telephone collection agent told her she could set up a plan to pay the bill, then "advised" her to send proof of payment. JA-442, 835. This encounter left Ms. Russell in tears. JA-444.

Despite her two reports of payment, on March 31, 2009, ACS sent Ms. Russell yet another collection letter about the $501 Sandhills bill, threatening,

> As you are aware, your account with Sandhills Emergency Physicians has not been satisfied. [...] We will be reporting your past due account to national credit bureaus. This information will remain on your credit file for the next seven (7) years. You may be denied credit in the future as a result.

JA-832. After reading this letter, Ms. Russell feared that ACS would ruin her credit, destroying her family's fragile finances. JA-452. Her husband found her crying and upset. JA-536. She then complained to the Better Business Bureau (BBB) about ACS's threat to report the paid off account to the credit bureaus as "past due." JA-

454. When ACS received the BBB complaint, it was able to confirm, by a single phone call on the same date, that Ms. Russell had already paid the $501 balance on the bill and that Sandhills had posted the payment on January 8. JA-662.

According to ACS's own records, between February 6, when Ms. Russell notified it that her payment had cleared the bank, and April 9, the date of the BBB contact, ACS did nothing to confirm with Sandhills that Ms. Russell had made the payment. JA-835. Its policy, in fact, is not to call creditors to confirm payments, in part because making such calls would be "too time consuming." JA-667. None of the telephone collection agents who spoke with Ms. Russell even checked with ACS's own payment processing department, which tracked payments consumers made directly to their healthcare providers, to verify the payment. JA-1123.

## C.  Proceedings Below

*Ms. Russell's Lawsuit.* Ms. Russell thereafter sought relief by filing a lawsuit under the FDCPA and North Carolina's Prohibited Practices by Collection Agencies statute (PPCA), N.C.G.S. § 58-70-90, *et seq.* She alleged that ACS had violated several provisions of the FDCPA, including §§ 1692e, 1692e(2)(A), 1692e(8), and 1692f when it continued after she notified it of her payment to claim that she owed $501 to Sandhills and when it threatened to report the paid-off bill to

the credit bureaus as "past due." JA-35-36. Ms. Russell also made similar claims under the PPCA, which parallels the FDCPA. JA-37.

*The Course of Discovery and Motions Practice Before Trial.* ACS denied Ms. Russell's allegations and asserted in the alternative a generic bona-fide-error defense to the FDCPA claims. *See* JA-44-54. In its initial discovery responses and amended discovery responses, ACS did not implicate any third parties in the alleged bona-fide error. *See* JA-72-87. Similarly, its initial Rule 26(a)(1) disclosures listed no employee or agent of a third party company as having "pertinent knowledge." *See* JA-88-91. Nor did the Rule 26(a)(1) disclosures list any documents or business records relative to any third party. *See id.* Nor did it disclose any such third party employee or agent in final pre-trial disclosures filed in anticipation of the original trial date in November 2010. *See* JA-58-62. Before the first trial setting, Ms. Russell filed a standard motion in limine requesting that the district court exclude evidence not disclosed under Rule 37(b)(2)(c). JA-63-66.

Meanwhile, ACS defeated Ms. Russell's summary-judgment motion on her FDCPA claims. In its response to the summary-judgment motion, ACS clarified that its bona-fide-error defense was based on its practice of asking consumers for proof of payment. *See*, *e.g.*, Affidavit of Christopher B. Malmfelt, JA-1036. It also referenced its "contractual reliance" on its clients "to promptly report payments on

10

accounts that have been referred to it," but gave no indication that there was any problem with payment reports in Ms. Russell's case. *Id.*

ACS later indicated in a pre-trial hearing in November 2010, however, that it was actually going to base its bona-fide-error defense on a failure of its internal systems to receive payment information that it said its client, Sandhills, was contractually obligated to report. It further asserted, without substantiation, that it had procedures in place to stop such errors from happening and that the error was unintentional because ACS contractually relied on Sandhills to update payment information. ACS's assertions in this hearing impelled Ms. Russell to file a second motion in limine seeking to exclude evidence of any previously undisclosed procedures between ACS and Sandhills. *See* JA-67-93.

The district court continued both the first and the second trial setting for this case: the first because time ran out for that trial session and the second due to inclement weather. JA-10, Minute entry dated 11/15/2010 and JA-11, Minute entry dated 1/10/2011. On January 10, 2011, after postponing the trial for the second time, the district court re-opened discovery on the bona-fide-error defense, "specifically with respect to any procedures that existed between Defendant and [Sandhills] requiring notice to Defendant of payments made to an account." Docket #75 at 1.

In response to Ms. Russell's discovery requests during the re-opened discovery period, ACS did not identify or produce any contract between it and Sandhills that obligated Sandhills to make payment reports to ACS. Nor did ACS identify or produce any contract between it and any third party that obligated any third party to make payment reports to ACS with respect to Sandhills.

ACS did produce some new information, however. In February 2011, ACS revealed a witness related to ACS's bona-fide-error defense that it had not disclosed during the previous twenty months of litigation: the longtime manager of its payment processing department, Laura Pavesi. JA-1144. ACS also for the first time disclosed evidence of payment reports related to its bona-fide-error defense, information that dated back to January 2009 and about which it had known throughout the litigation. *Id.*

The nature of ACS's bona-fide-error defense morphed again during the re-opened discovery period; no longer did ACS blame Sandhills for not sending it a payment report; rather, it switched to blaming a previously undisclosed third-party company, McKesson Corporation. *E.g.*, JA-1102., 1115-16, 1130 In late March 2011, mere weeks before the trial date, Ms. Russell's attorneys learned that yet another previously undisclosed third-party company, PST Services, Inc., may also have been involved. JA-873-74. Just prior to trial, the missing payment report from

12

McKesson—verifying that Ms. Russell had indeed made the payment to Sandhills as she reported—finally surfaced. JA-876.

*Ms. Russell's Motion in Limine.* On March 21, 2011, ACS filed amended pre-trial disclosures indicating that it now intended to offer into evidence the testimony of Laura Pavesi and the McKesson payment reports. *See* JA-99-104. The belated disclosures prompted Ms. Russell to file a final motion in limine with objections to ACS's late disclosures, asking that the Court prohibit ACS from asserting any defense or introducing any evidence blaming any other entity for not providing it with a payment report. *See* JA-105-33. Ms. Russell argued that ACS's failure to disclose the factual basis for its bona-fide-error defense for twenty months was not substantially justified and that the nondisclosure was prejudicial to her. Therefore, she argued, the court should exclude the evidence under Rule 37(c)(1).

ACS opposed the motion, arguing then—as it does now on appeal—that because Ms. Russell had learned of the information that ACS listed its final Rule 26(a)(3) disclosures during the re-opened discovery period in February and March 2011, there could not possibly be any prejudice. JA-134-79.

The district court held several hearings on the motions in limine at which he reviewed the depositions of Laura Pavesi and Christopher Malmfelt in their entirety. He also took testimony from Malmfelt and Pavesi and questioned them

directly about ACS's relationships with Sandhills, McKesson, and PST. When questioned regarding the alleged contractual reliance on Sandhills or McKesson to provide payment reports, Malmfelt testified to the effect that he did not know if any contract included such a provision. JA-306, 309-10.

As the district court noted during the hearing, the evidence that ACS now presented on the bona-fide-error defense appeared very different from what it had presented during its arguments opposing Ms. Russell's partial motion for summary judgment in 2010. JA-230, 325. The court also noted that ACS had not revealed that its bona-fide-error defense relied on any issue with a missing payment report until long after initial discovery closed, nor had it disclosed Laura Pavesi as a witness nor provided her in response to the original Rule 30(b)(6) deposition notice, which had included as topics the bona-fide-error defense and ACS's procedures to avoid FDCPA violations. JA-320-23. The court granted Ms. Russell's motions in limine, excluding Pavesi's testimony and evidence related to McKesson and PST, and any duty of Sandhills, McKesson, or its subsidiaries to provide payment reports. JA-587-88. (The excluded evidence is discussed in greater detail below.)

*The Trial.* Trial commenced immediately thereafter. At the close of Ms. Russell's evidence, ACS moved for a directed verdict. JA-543. The court denied

the motion. JA-595. It noted that ACS had made statements in its collection letters to Ms. Russell that were "not, in fact true." JA-594-95. Following the close of all evidence, Ms. Russell moved for a directed verdict on her FDCPA claims. JA-676. The Court granted her motion as to her claims under § 1692e, citing statements in the collection letters that were "objectively false" and the March 31 letter containing what was "clearly a threat to communicate false information to a credit bureau." JA-681.

With respect to the bona fide error defense, the court's directed-verdict ruling identified two errors—(1) ACS's failure to credit Ms. Russell's payment to her account after receiving notice from her on February 6, 2009 about her payment, which it had noted in its own internal collection records, and (2) its failure to stop collection on the account after receiving that notice. JA-683. The judge held that ACS had not presented any evidence that would support a jury finding that these errors were, in fact, bona fide. *Id.*

The jury found for Ms. Russell on her PPCA claims and awarded her $37,501.00. JA-837-40. The award consisted of $1,000 in statutory damages under the FDCPA, $6,000 in statutory damages under the PPCA, and $30,501 in actual damages under both statutes. *Id.* The district court subsequently denied ACS's motions for a new trial and relief from judgment. JA-863-72.

15

### D. The Excluded Evidence

As noted above, ACS opposed Ms. Russell's motion in limine on the ground that the excluded evidence could be used to support its bona-fide-error defense—namely, that it had reasonable procedures in place to update consumers' payment records. But the excluded evidence shows just the opposite.

ACS did not allow its telephone collection agents to verify a consumer's verbal report of having made a payment directly to the creditor. Thus, as a matter of policy, the telephone collection employees to whom Ms. Russell had reported her payment had no power to contact Sandhills to confirm a payment. JA-975. They could not even call ACS's own payment processing department to confirm a payment. JA 1090-91. All that the telephone collectors could do was ask for proof of payment from the consumer herself. Deposition testimony revealed that that the company discouraged even collection floor supervisors from contacting healthcare providers to verify consumers' claims of payment. JA-991. In fact, inter-company communication was so poor that Laura Pavesi, the manager of payment processing, did not learn until January 2011—two years after Ms. Russell had paid the bill—that the Sandhills payment report for the bill was missing. JA-1124.

Neither did ACS have any mechanism by which Sandhills could update its patients' payment records with ACS automatically or expediently. Although ACS

submitted an affidavit in opposition to summary judgment swearing that it "maintains efficient electronic data systems for prompt reporting and application in its systems of payments that do not come directly to it" (JA-1036), the excluded evidence showed that it had no such systems in place with respect to Sandhills. Instead, to verify such a payment by a consumer to Sandhills, ACS passively waited for manual (mail) delivery of weekly payment reports from either McKesson or PST regarding Sandhills. JA-263 and 1138. ACS's payment processing department then painstakingly entered the reports, which could be up to 500 pages long, into the electronic collection records by hand. JA-1138.

ACS did not place importance on updating consumers' collection files in a timely manner to reflect payments made directly to the healthcare providers. The excluded evidence showed that the payment processing department had regular communications by email, fax, and telephone several times a week with McKesson and/or PST, who apparently handled Sandhills' billing information. JA-300, 1088, 1091-92. ACS could also apparently contact these third-party intermediaries to obtain same-day discounts for a consumer with a Sandhills bill. JA-654-55. But as to updating payment information, ACS simply waited on whatever the third-party intermediaries provided, whenever they sent it. JA-310, 1100-04 Furthermore,

17

ACS's payment processing department did not have any direct communications with Sandhills. JA-1092.

Finally, ACS had no formal procedure in place for how Sandhills was to report to ACS that a patient had paid Sandhills directly. JA-1084-85. Its affidavit in opposition to summary judgment stated that ACS "contractually relies on its hospital clients to promptly report payments on accounts that have been referred to it." JA-1036. In reality, however, as its management admitted in the pre-trial evidentiary hearing, there was no contract between ACS and Sandhills, nor between ACS and McKesson. JA-296, 309-10. PST or McKesson, rather than Sandhills, sent the payment reports. JA-257. The payment processing department had no formal system of tracking mailings received; individual payment processors kept their own mail logs informally and destroyed the logs at their discretion. JA-264-65, 1106.

ACS was unconcerned if no reports arrived for a particular week, assuming that it was just a "gap." JA-290, 300. There was no procedure to follow up on missing payment reports unless two full weeks went by without any reports arriving. JA-1103-04, 1115-16. At that point, it was up to each individual payment processor to bring missing reports to the department manager's attention. JA-257, 266. If two weeks went by without any reports arriving, ACS would finally contact

McKesson by phone to inquire as to their whereabouts. JA-1105-06. The excluded facts and documents thus confirm that, as to consumers who verbally reported having paid their bill directly to Sandhills, ACS's procedures to prevent making false statements about nonpayment and to prevent making wrongful threats about credit reporting were non-existent, or at best, woefully inadequate.

## SUMMARY OF ARGUMENT

Because the FDCPA is a strict liability statute, the district court correctly directed a verdict for Ms. Russell on her claims that ACS violated the statute's express prohibitions against the false representation of the amount of her debt (15 U.S.C. §§ 1692e and e(2)(A) and against the "threat to communicate to any person credit information which is known or which should be known to be false" or "to take any action that cannot legally be taken"—the threat to report her debt to the credit bureau as unpaid when she repeatedly told them it had been paid. §§ 1692e(5), (8).

The trial court did not abuse its discretion in entering a directed verdict against ACS based on its non-existent efforts to avoid the specific violations. ACS could have escaped liability if it had shown "by a preponderance of the evidence that the violation was not intentional and resulted from a bona fide error

notwithstanding the maintenance of procedures reasonably adapted to avoid any such error." § 1692k(c). It did not have any procedures in place to avoid these express prohibitions. Rather, the evidence presented at trial showed that its policy was to ignore Ms. Russell when she reported to its collectors that she had already made her payment and to ignore its own collection notes documenting Ms. Russell's statement that her payment check had cleared. Because ACS was unable to prove it had procedures in place reasonably adapted to avoid making the false statements and threats to Ms. Russell, the trial court properly found that ACS's violations of the FDCPA were not bona fide errors.

ACS argues that Ms. Russell's failure to dispute the debt within the thirty-day validation period allowed it to continue to collect, regardless of whether that continued collection included false statements or threats. While Ms. Russell did not dispute the validity of the debt, she could and did properly claim *after* paying the debt that she had paid it directly to the creditor. ACS's belief that it could make false statements merely because the consumer did not dispute the debt within the statutory validation period is an error of law that, as the U.S. Supreme Court has recently explained, the bona-fide-error defense does not excuse.

## STANDARD OF REVIEW

This Court "accept[s] the factual findings of the district court unless they are clearly erroneous and review[s] the district court's application of legal principles *de novo.*" *Lone Star Steakhouse & Saloon, Inc. v. Alpha of Virginia, Inc.*, 43 F.3d 922, 939 (4th Cir. 1995). "The standard of review regarding a directed verdict is whether the evidence is such, without weighing the credibility of the witnesses, that there is only one conclusion that reasonable jurors could have reached." *Keller v. Prince George's County*, 827 F.2d 952, 955 (4th Cir. 1987).

Generally, evidentiary rulings are subject to the abuse of discretion standard. A trial court abuses its discretion when it makes an error of law. *College Loan Corp. v. SLM Corp.*, 396 F.3d 588, 595 (4th Cir. 2005). "We review a district court's evidentiary rulings for abuse of discretion and subject such rulings to harmless error review." *United States v. Johnson*, 587 F.3d 625, 637 (4th Cir. 2009). An evidentiary ruling will be overturned where it is arbitrary and irrational. *United States v. Cone*, 714 F.3d 197, 219 (4th Cir. 2013).

An appellate court reviews a district court's decision to deny a motion for new trial for "clear abuse of discretion and will not reverse absent exceptional circumstances." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 650 (4th Cir. 2002) (citations omitted). A district court should grant a new trial under

Rule 59 "only if 1) the verdict is against the clear weight of the evidence, 2) is based on evidence which is false, or 3) will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict." *Id.* (emphasis added). An appellate court also reviews a district court's ruling on a Rule 60(b) motion for relief from judgment for abuse of discretion. *Aikens v. Ingram*, 652 F.3d 496, 501 (4th Cir. 2011).

## ARGUMENT

## I.  THE DISTRICT COURT WAS CORRECT AS A MATTER OF LAW TO DENY A DIRECTED VERDICT TO ACS.

### A.  A reasonable jury could only have found in Ms. Russell's favor at the close of her evidence at trial.

The evidence that Ms. Russell presented in her case at trial was that she received an initial collection letter from ACS in December 2008, the specific content of which she could not recall. JA-421. She testified at trial that, after receiving the letter, she mailed full payment for the bill to Sandhills within the month (JA-425) and that, after receiving another collection letter, she called ACS on February 6, 2009, to report her payment (JA-431). Further, Ms. Russell testified that ACS did not ask her for proof of payment during the February 6 phone call, but, rather, that its employee stated that she would "make a note" of the payment.

JA-434. Ms. Russell's evidence further showed that, after receiving another collection letter (JA-831) from ACS, she again called it on or about February 27, 2009, to remind it of the payment, and that ACS only at that time advised her to send written proof of payment. JA-442. Ms. Russell testified that during the same call, ACS tried to get her to set up a payment plan. *Id.* She additionally entered into evidence and testified regarding a letter that ACS sent her in March 2009 threatening her credit report. JA-832.

The evidence Ms. Russell presented in her case in chief, then, showed that Defendant knew no later than February 6, 2009 that she had paid her bill in full. The evidence at that point in the trial further showed that, despite this knowledge, ACS thereafter continued to target Ms. Russell for collection, making statements in its letters such as "Our records indicate that you still owe $501" and "As you are aware, your account with Sandhills Emergency Physicians has not been satisfied." Viewing this evidence in the light most favorable to Ms. Russell, the district court properly determined that there was a legally sufficient evidentiary basis for a reasonable jury to find for Ms. Russell on her FDCPA claims that ACS misrepresented to her the amount and status of the debt and wrongfully threatened to report her paid-off bill to the credit bureaus as delinquent.

**B. A consumer's failure to dispute a valid debt does not excuse the debt collector's subsequent false statements and threats.**

In arguing that the district court erred in denying ACS's directed verdict motion, ACS (at 32) relies extensively on Ms. Russell's initial failure to dispute the debt. It contends it could continue to collect the debt absent a dispute under § 1692g(a)(3). That section of the Act requires the debt collector to notify the consumer that, unless she within thirty days of such notification "disputes the validity of the debt or any portion thereof, the debt will be assumed to be valid by the debt collector." Because her debt to Sandhills for Jerry's emergency room visit was valid, however, Ms. Russell did not dispute the validity of the debt after receiving the first collection letter from ACS; rather, she promptly paid the debt.

A consumer's failure to dispute a debt within the initial 30 day period provided in § 1692g does not give a collector a free pass to engage in violations of § 1692e by falsely claiming the consumer owes a debt that the consumer has paid. It "merely allows the debt collector to proceed under what [one court has] aptly describe[d] as a 'temporary fiction' that the debt stated in the validation notice is true." *Nelson v. Select Financial Services, Inc.,* 430 F. Supp. 2d 455, 457 (E.D. Pa. 2006). Not surprisingly, no appellate case law supports ACS's position, and district court rulings unanimously reject its argument.

24

The reason for this is simple: To accept ACS's contrary argument would "encourage debt collectors to arbitrarily send a written notice to any person falsely claiming that person owed a debt." *Gigli v. Palisades Collection, L.L.C.*, 2008 WL 3853295, at *5-7 (M.D. Pa. Aug. 14, 2008). So long as the consumer makes no dispute within thirty days, "the debt collector may then institute a debt collection action repeating the same false representations without fear of FDCPA liability." *Id.* But immunizing unscrupulous debt collectors, while depriving consumers of a remedy, is hardly consistent with the FDCPA.

A consumer may make an oral dispute of a debt at any time. *Grant-Fletcher v. Brachfeld Law Group, PC.*, 2012 WL 2523094 *3 (D. Md. June 28, 2012) ("Plaintiff's right to dispute her debt does not expire."). After she paid the valid debt and then received another collection letter, Ms. Russell's verbal dispute as to the amount that the letter stated she owed was, therefore, legitimate. Receipt of such an oral dispute requires the debt collector report the dispute to the credit bureaus. "Oral dispute of a debt precludes the debt collector from communicating the debtor's credit information to others without including the fact that the debt is in dispute." *Camacho v. Bridgeport Fin., Inc.*, 430 F.3d 1078, 1082 (9th Cir. 2005); *see Brady v. Credit Recovery Co.*, 160 F.3d 64, 67 (1st Cir. 1998). Yet ACS threatened to report Ms. Russell's paid debt as unpaid. Reporting a debt to a credit

bureau is "a powerful tool designed, in part, to wrench compliance with payment terms. . . ." *Rivera v. Bank One*, 145 F.R.D. 614, 623 (D.P.R. 1993). The Federal Trade Commission agrees: "[W]e believe the reality is that debt collectors use the reporting mechanism as a tool to persuade consumers to pay, just like dunning letters and telephone calls."[1]

ACS's arguments regarding the § 1692g dispute provision are also futile because Ms. Russell has never claimed that ACS violated § 1692g. She has made no allegation that ACS failed to send her notice of her right to dispute the Sandhills bill nor any allegation that ACS contacted her after receiving a written dispute. She merely claims that ACS's collection efforts after her verbal notification of payment, which it acknowledged in its records, violated the prohibitions against false, deceptive or misleading means of collecting a debt, resulting in strict liability under the FDCPA.

The introduction to ACS's brief asserts that "At the heart of this case is one concise issue: Was the defendant, Absolute Collection Service ("ACS") required to cease collection on what it reasonably believed to be a valid debt upon a mere oral dispute from a consumer?" There is no such "cease collection" claim in this case.

---

[1] Federal Trade Commission, Staff Letter to Cass, December 4, 1997, http://www.ftc.gov/os/statutes/fdcpa/letters/cass.htm

ACS's opening brief is focused on a red herring. The court below cannot be faulted in any of its rulings because of this non-issue.

Indeed, if ACS contends that the FDCPA allows it to makes false statements and threaten to report a paid-off debt to the credit bureaus as delinquent merely because Ms. Russell did not dispute the validity of the account within thirty days, its error is one of law that the bona fide error defense does not excuse. *Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*, 559 U.S. 573, 130 S. Ct. 1605, 1614-15 (2010).

## II. THE DISTRICT COURT WAS CORRECT AS A MATTER OF LAW IN GRANTING A DIRECTED VERDICT TO MS. RUSSELL ON HER FDCPA CLAIMS.

### A. A reasonable jury could only have found in Ms. Russell's favor at the conclusion of evidence at trial.

ACS's case in chief provided more than enough evidence for the district court to grant a directed verdict for Ms. Russell. Most importantly, ACS's own collection notes, which it entered into evidence, included a note made by its employee Shamrika Johnson for the date "2/6/09" that "DEBTOR SAYS PAID $501 W/ CHECK DEBTOR STATES THAT THE CK CLEARED HER BANK." JA-835. Additionally, ACS's employee Husna Jones, who spoke to Ms. Russell on February 27, 2009, testified that the company's software gave her access to those

27

account notes and that she saw the prior note regarding payment when she spoke with Ms. Russell that day. JA-580-81.

The undisputed evidence, then, was that Ms. Russell paid her bill in full, that ACS knew no later than February 6, 2009 that the bill was paid in full, and that, in fact, its employee had noted the payment in its own records. The evidence further showed that, despite this knowledge and its own note, ACS thereafter continued to target Ms. Russell for collection, stating "We are dismayed by your inaction," "Our records indicate that you still owe $501" and "you are ignoring our requests for payment." JA-831. ACS also threatened, "[W]e will be reporting your past due account to national credit bureaus." JA-832.

Viewing the evidence in the light most favorable to ACS, a reasonable jury could draw only one conclusion from the facts presented with respect to Ms. Russell's claims under 15 U.S.C. §§ 1692e, e(2)(A) and e(10): that ACS's statements that Ms. Russell had been "inactive," that she still owed money, and that she had been "ignoring" payment requests were all objectively false at the time ACS made them, and that ACS falsely claimed its records indicated Ms. Russell still owed money, when, in fact, its internal records showed that she had reported paying the bill.

Furthermore, a reasonable jury could draw only one conclusion from the undisputed facts presented with respect to Ms. Russell's claim under 15 U.S.C. § 1692e(8): that ACS's statements regarding her credit report were threats to report the bill as past due when ACS knew or should have known such information to be false. Indeed, a jury did find exactly that, since the *Russell* jury deliberated the questions of whether ACS had violated mirror-image provisions of the PPCA at N.C.G.S. § 58-70-95 (collection by means of unfair threat, coercion, or attempt to coerce, including "(3) Making or threatening to make false accusations to another person, including any credit reporting agency, that a consumer has not paid, or has willfully refused to pay a just debt") and N.C.G.S. § 58-70-110 (collection by means of any fraudulent, deceptive, or misleading representation).

Finally, viewing the evidence in the light most favorable to ACS, a reasonable jury could only have determined that ACS erred in failing to credit Ms. Russell's payment to her account, and erred again in failing to update its system to stop sending collection letters after Ms. Russell notified its employees personally that she had paid the bill in full. A reasonable jury could only have concluded that ACS had presented no evidence to support its claim that those errors were unintentional or its claim that it maintained procedures reasonably adapted to avoid such errors.

In any event, the directed verdict to Ms. Russell on her FDCPA claim, if in any way erroneous, was harmless error, because the jury found for her on her PPCA claims, which were based on the same set of facts. JA-837-40.  Additionally, the jury awarded the same amount of actual damages under the PPCA as it awarded under the FDCPA. *Id.* This suggests that, even if the court had denied Ms. Russell's directed verdict motion and left the FDCPA claims for the jury, the jury would have also found for Ms. Russell on those claims, and the actual damages awarded would have been the same. This is a quintessential example of "harmless error." Even if the jury had for some reason found for ACS on the FDCPA claim, Ms. Russell's award would have diminished, at most, by the $1,000 in statutory damages, which is *de minimis* given the amount of the verdict and the attorney's fees and costs subsequently awarded.

### B. ACS made no effort to avoid falsely claiming Ms. Russell owed money or to avoid wrongfully threatening to report the paid-off bill to the credit bureaus as delinquent.

ACS also contends that the district court erred in directing a verdict for Ms. Russell on the bona-fide-error defense of § 1692k(c). To successfully invoke this defense, a debt collector must show, by a preponderance of the evidence, that (1) its violation of the FDCPA was "not intentional" and (2) "resulted from a bona fide

error" and (3) was clerical, not an error of judgment and (4) that the debt collector maintained additional reasonable preventive procedures to avoid the error. *Id.*

The safe harbor of bona-fide error is available only if the debt collector proves each component. *Pipiles v. Credit Bureau of Lockport, Inc.*, 886 F.2d 22, 27 (2d Cir. 1989); *Edwards v. Niagara Credit Solutions, Inc.*, 584 F.3d 1350, 1353 (11th Cir. 2009) (A debt collector's failure to meet any one of the elements is "fatal to the defense"). If the debt collector merely claims mistake without procedures to prevent the error that occurred, the bona fide error defense fails. *Reichert v. Nat'l Credit Sys., Inc.*, 531 F.3d 1002, 1006 (9th Cir. 2008).

**1. The debt collector must admit to an error to take advantage of the defense**. In Ms. Russell's case, ACS testified multiple times that it did not make any mistakes in handling Ms. Russell's collection: in deposition (JA-1061, 1129, 1203), at the pre-trial evidentiary hearing (JA-268, 303), and at trial (JA-652). Moreover, its position in its brief to this Court (at 39-40) is that it made no error because, as a matter of law, its subsequent collection efforts were entirely proper due to Ms. Russell's failure to dispute the validity of the debt within the thirty day validation period.

**2. The error must be clerical in nature, rather than an error of judgment.** ACS made no clerical error that the bona-fide-error defense could excuse. Rather,

31

it made the poor judgment call not to put a procedure in place to ensure that payment reports were received and processed properly and promptly. Thus, its payment processing staffers passively waited for reams of payment records to come in the mail and were not alarmed when they did not receive any payment records for weeks. McKesson ultimately provided a copy of the payment report containing proof of Ms. Russell's payment shortly before trial, but ACS never proffered any explanation for its failure to receive or record Ms. Russell's payment at the time it she made it. ACS also made the poor judgment call to prohibit its telephone collection agents from calling on Sandhills, McKesson, or the payment processing department to confirm a consumer's report of payment. According to pre-trial and trial testimony, to allow its collection employees to do so would be too "expensive" (JA-282) and "time-consuming" (JA-645) for the company, particularly when it believed that most consumers who said they paid were not truthful. JA-652. These intentional errors in judgment led to ACS's violations of the FDCPA.

3. **A bona fide error defense requires that the debt collector have reasonable preventive procedures in place.** ACS claims (at 13) that the entirety of its unwritten procedure involved "Collection Posting Reports and payment updating procedures using information obtained from a client or a client's agent." But noticeably absent from the testimony that ACS would have introduced at trial

had the court not excluded it—set forth in its brief at pages 24-25—is any procedure for tracing a payment when a consumer directly and repeatedly says she has paid in full. Also absent is any procedure for tracking missing payment posting reports from any third-party intermediary, particularly in the time frame when a consumer claims to have made payment. Nothing in ACS's procedures could have avoided the "error" (not recording Ms. Russell's payment) that occurred here because it had no procedure aimed at avoiding the particular error.

The Supreme Court has explained that the "procedure" contemplated by the FDCPA's bona fide error defense should be understood in light of the dictionary definition of that word as "a series of steps followed in a regular orderly definite way." *Jerman*, 130 S. Ct. at 1614. The phrase, the Court further explained, "is more naturally read to apply to processes that have mechanical or other such 'regular orderly' steps to avoid mistakes—for instance, the kind of internal controls a debt collector might adopt to ensure its employees do not . . . make false representations as to the amount of a debt." *Id.* Here, ACS implemented no mechanical, regular, or orderly steps. It simply sat back and awaited updated payment information from a billing service for the creditor. If the payment information arrived, it was entered. If it did not come, ACS remained oblivious. It had no internal controls to alert it when reports were missing. JA- 263-65. 1102-07.

In similar circumstances, appellate courts have found, as a matter of law, that the bona-fide-error defense was not available. *See Owen v. I.C. Sys., Inc.*, 629 F.3d 1263, 1276 (11th Cir. 2011) (debt collector cannot fulfill its obligation to "maintain procedures" to avoid improper debt collection by outsourcing its oversight tasks to its creditor); *McCollough v. Johnson, Rodenburg & Lauinger, LLC*, 637 F.3d 939, 948-49 (9th Cir.  2011) (bona-fide-error defense does not protect a debt collector whose reliance on the creditor is not reasonable; like Ms. Russell, Mr. McCollough had informed the collector of his defense by telephone)*; see also Fox v. Citicorp Credit Services*, *Inc.*,15 F.3d 1507, 1514 (9th Cir. 1994) (hard-copy account file was delayed in arriving, and there was no indication that debt collector maintained any procedure to ensure expeditious transmission of all pertinent information between offices).

That is because passive reliance on a third party, "respectfully, is not even a procedure. It is merely an unfounded assumption that is not based on any fact or any understanding and/or agreement with its creditor-clients." *Turner v. J.V.D.B. & Associates, Inc.*, 318 F. Supp. 2d 681, 686-87 (N.D. Ill. 2004)*. See also Isham v. Gurstel, Staloch & Chargo, P.A.*, 738 F. Supp. 2d 986, 999-1000 (D. Ariz. 2010) ("the proper handling of consumer mail and communications is fundamental to ensuring the accuracy of the electronic debtor accounts."). In *Isham*, mail handling

34

procedures uncannily like ACS's failed the bona-fide error test as a matter of law. The court observed that the debt collector's failure to account for the consumer's letter was not excusable because "there were no written procedures in any of the employee manuals which outlined proper mail handling" and "there was no way to confirm that a piece of mail was properly received and handled." *Id.*

ACS in this case claims it did not commit an error, which itself explains the lack of procedures directed to preventing its false statements that Ms. Russell's debt remained unpaid.[2] The bona-fide-error defense's "purpose is not to shield collectors from liability for systemic errors or abuses. Because Defendant routinely applied the wrong standard . . .   it could not have maintained procedures reasonably adapted to avoid the . . . violation which occurred in the present case. Thus, Defendant's bona fide error defense conclusively fails." *Martinez v. Albuquerque Collection Services, Inc.*, 867 F. Supp. 1495, 1503 (D.N.M. 1994).

## III. THE TRIAL COURT DID NOT ERR IN ITS EVIDENTIARY RULINGS.

ACS devotes much of its brief to purported procedural defects in pretrial, trial, and post-trial rulings. The district court's determinations, however, were

---

[2] Def. Opening Brief, Doc. 32 at 25: "ACS could not make a false representation about the nature of the debt where the law allowed ACS to assume the debt was valid. Thus, as a matter of law, ACS was entitled to continue reasonable collection efforts on the debt in question"

substantively and legally unassailable. As discussed at length above, ACS had no procedures in place to prevent its misrepresentations to Ms. Russell and its threats to report her paid-off account to the credit bureaus as delinquent. ACS simply did not have a bona-fide-error defense as a matter of law. The district court's exclusion of the evidence in question, was, therefore, harmless to ACS. Nevertheless, Ms. Russell will address ACS's arguments.

### A. ACS did not comply with Rule 26(a) and (e) in that it knew of the existence of the bulk of the evidence in question from the time it received Ms. Russell's first set of discovery requests in 2009, yet it failed to disclose the evidence's existence until February 2011.

ACS first argues that the district court abused its discretion in granting Ms. Russell's motions in limine to exclude the testimony of Laura Pavesi and evidence regarding McKesson and collection posting reports. In support of its argument, ACS asserts (at 17) that it complied fully with the rules concerning initial disclosures, supplemental disclosures, and discovery responses. In fact, ACS did not properly comply with the rules. The district court did not abuse its discretion in excluding this evidence.

The Federal Rules of Civil Procedure require automatic initial disclosure of the identities of "each individual likely to have discoverable information—along with the subjects of that information—that the disclosing party may use to support

its claims or defenses [...]" Fed. R. Civ. P. 26(a)(1)(A)(i). The rule also requires disclosure of "all documents, electronically stored information, and tangible things that the disclosing party has in its possession, custody, or control and may use to support its claims or defenses [...]" Fed. R. Civ. P. 26(a)(1)(A)(ii).

ACS knew of the existence of its employee Laura Pavesi and of its own payment report records from the day it responded to Ms. Russell's first discovery requests in November 2009. Nevertheless, it did not disclose this witness or this evidence in its November 2009 responses, in its amendment to those responses, in its initial disclosures in December 2009, or at any time prior to the first trial setting in October 2010 or the second trial setting in January 2011. In considering Ms. Russell's motion in limine, the district court clearly was concerned by ACS's failure to disclose this evidence in initial discovery responses and in multiple failures to disclose during the fifteen months thereafter. *See*, *e.g.*, JA-331  ("... Defendant is under a duty to timely and candidly and directly respond to discovery requests. In this case, I find that that was not done, and the evidence that was not disclosed should have been and went directly to the heart of the case.")

Rule 26(e) governs supplementation of disclosures. It requires that a party supplement and correct its Rule 26(a) disclosures and discovery responses in a timely manner if the party learns that in some material respect the disclosure or

37

response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing.  Fed. R. Civ. P. 26(e)(1)(A). A trial court may sanction a party who fails to supplement or correct disclosures or discovery responses by excluding evidence, excluding claims, ordering a continuance of trial for to accommodate further discovery, or, in its discretion, any other sanction it deems proper.  In fact, as discussed further below, Rule 37(c)(1) flatly precludes use of such information unless the failure to disclose was substantially justified.

Here, at least from November 2010 onward, ACS intended to present evidence of a bona fide error defense based on payment reports. Yet it did not supplement its disclosures at that time to identify Laura Pavesi or the documents in question. Ms. Russell had to go through the process of filing a motion in limine, and the district court had to re-open discovery and order ACS to respond to questions on this issue before ACS would make such identifications.

Rule 26 also governs pre-trial disclosure content and sets deadlines for such disclosures. At least thirty days prior to trial, parties must identify witnesses that they expect to call and exhibits that they expect to present. Fed. R. Civ. P. §§ 26(a)(3)(A)(i), (ii), and (B). If a party does not properly disclose a witness or exhibit under Rule 26(a)(3), the trial court may exclude such evidence from use at trial.

Advisory Committee Notes to 1993 Amendment to Rule 26.  Furthermore, M.D.N.C. L.R. 40.1(c) requires that all parties "comply in all respects with Rule 26(a)(3) regarding final pretrial disclosure, including the time requirements set forth therein."

Here, ACS did not identify Laura Pavesi or the payment report documents in pre-trial disclosures prior to the first trial date in November 2010, nor prior to the second trial date in January 2011. Instead, it filed pre-trial disclosures under Rule 26(a)(3)(A) on March 21, 2011, just fourteen days prior to the third trial date of April 4, 2011. *See* JA-99. The timing of ACS's disclosures did not comply with Rule 26(a)(3)(B) or the Local Rules.

ACS (at 17) attempts to paint its extremely belated identification of Laura Pavesi, the documents, and McKesson as proper because Ms. Russell's counsel learned of them during the re-opened discovery period in 2011. But that was not the issue before the district court.  The issue there was whether the failure to make such disclosures during initial discovery, or to supplement them during the subsequent year, was so unjustified and so prejudicial to Ms. Russell that the court should exclude it. The judge stated that "the short timeframe and various other matters relating to trial preparation, including the location of McKesson and any related companies, significantly hampered the ability of the Plaintiff to fully

39

investigate the information that was provided in the late discovery." JA-329. While the re-opening of discovery did enable Ms. Russell to learn of new evidence, the district court reasoned, that was insufficient to cure the disadvantage ACS caused her by its failure to disclose most of the same evidence for the prior year-and-a-half.

### B. ACS's failure to disclose the excluded evidence sooner was neither substantially justified nor harmless.

Rule 37(c)(1) prohibits parties who fail to satisfy Rule 26's disclosure and supplementation requirements without "substantial justification" from using the undisclosed evidence "at trial, at a hearing, or on a motion," unless the failure is "harmless." *Southern States Rack and Fixture, Inc. v. Sherwin Williams Co.*, 318 F.3d 592, 595 (4th Cir. 2003). In determining whether a party's failure to disclose evidence was harmless or substantially justified, a district court should consider the following factors: "(1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; (5) the nondisclosing party's explanation for its failure to disclose the evidence." *Id.* at 597.

The district court had ample evidence before it upon which to base its decision on ACS's lack of justification and the prejudice to Ms. Russell. Its decision

to exclude the evidence was not an abuse of discretion. Applying the *Southern States* factors, the district court found that the evidence in question was indeed important to Ms. Russell's case. JA-330. After reviewing the conflicting evidence and testimony regarding ACS's contractual obligations, the identity of its client, and the nature of its procedures, the court also found that the late disclosure would have surprised Ms. Russell. JA-328. The court found that the imminence of trial coupled with the location of McKesson, its personnel, and other potential evidence in other far-off jurisdictions made it difficult for Ms. Russell to conduct further discovery necessary to cure the surprise. JA-328-29. The court noted that it had already continued the trial twice, that the summary judgment stage had passed, and that ACS's prior assertions regarding its contractual obligations had "substantially" affected its ruling at summary judgment. JA-330.

Finally, and most crucially, the court found that ACS did not comply with its "duty to timely and candidly and directly respond to discovery requests." JA-331. ACS's witness testimony regarding its inconsistent discovery responses over the course of the case was "not persuasive" and not "entirely credible either." JA-350. In summary, the district court properly determined in its discretion that ACS had not substantially justified its failure to disclose the evidence in question earlier and that its failure to do so was not harmless.

41

ACS (at 22-23) says that it was not aware itself of the existence of the intermediary company PST until late in the re-opened discovery period, and that the district court therefore erred in excluding evidence related to PST because ACS's failure to identify PST earlier was not out of bad faith. In actuality, "bad faith" is not a consideration in a Rule 37(c)(1) determination, and the district court did not cite "bad faith" in its ruling. Rather, it appropriately applied the *Southern States* factors as described above.

### C. The motion in limine complied with applicable local rules.

ACS also argues that Ms. Russell's motion in limine was procedurally defective because Ms. Russell's counsel did not arrange a discovery conference or certify that one took place prior to filing the motion and because ACS "was not afforded sufficient opportunity to respond" to the motion. Opening Brief, Doc. 32 at 44. To the contrary, a party may object to the use of an exhibit in an adversary's pre-trial disclosures by filing and serving a list of objections and the grounds for objections within fourteen days of the adversary's disclosure of its intent to use the exhibit. Fed. R. Civ. P. 26(a)(3)(B). This is exactly what Ms. Russell did when she filed her motion in limine and objections immediately, the day after ACS filed its belated pre-trial disclosures. According to the Advisory Committee Notes, *supra*,

42

"The court may [...] elect to treat the listing as a motion "in limine" and rule upon the objections in advance of trial to the extent appropriate."

Furthermore, ACS's contention that it did not have sufficient time to respond to the motion in limine is without merit. ACS did in fact have sufficient time to respond to the motion, as it filed a lengthy response prior to the scheduled trial date, in which it made many of the same arguments it makes in this appeal, but without even suggesting any procedural defect. *See* JA-134-86. ACS also had ample time to voice its position regarding a procedural defect during the oral arguments at the extensive hearing on the motion, but apparently elected not to do so. In summary, Ms. Russell's motion in limine was both legally and procedurally sufficient, and the district court did not err in granting it.

## IV.    THE TRIAL COURT DID NOT ERR IN DENYING THE  POST-TRIAL MOTIONS.

Finally, ACS contends that the district court erred in denying its post-trial motions for a new trial and for relief from judgment, based on the same arguments regarding the directed verdicts and the exclusion of evidence. The district court properly denied the motion for a new trial, as ACS's arguments merely reflected its disagreement with the court's decision. The district court also properly denied the motion for relief from judgment because ACS showed no extraordinary

43

circumstances justifying such relief. The district court's denial of ACS's post-trial motions was not an abuse of discretion, because the clear weight of the evidence supported the jury's verdict, and no miscarriage of justice resulted.

## CONCLUSION

The district court's judgment should be affirmed.

Respectfully submitted,

*/s/ Suzanne R. Begnoche*

Joanne Faulkner
123 Avon Street
New Haven, CT
(203) 772-0395

Suzanne R. Begnoche
312 West Franklin Street
Chapel Hill, NC 27516
(919) 960-6108

Deepak Gupta
Gupta Beck PLLC
1625 Massachusetts Avenue, NW
Washington, DC 20036
(202) 470-3826

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because this brief (as indicated by my word processing program, Microsoft Word) contains [9,863] words, excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii). I further certify that this brief complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because this brief has been prepared in a proportionally spaced typeface of 14-point Baskerville.

Dated: July 15, 2013                                    */s/ Suzanne R. Begnoche*
                                                        *Counsel for Appellee*

45

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on this 15th day of July, 2013, I caused this Brief of Appellee to be filed electronically with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

Sean T. Partrick, Esq.
Allison J. Becker, Esq.
Jennifer D. Maldonado, Esq.
Yates, Mclamb & Weyher, LLP
Post Office Box 2889
Raleigh, North Carolina 27602
*Counsel for Appellant*

/s/ *Suzanne R. Begnoche*
*Counsel for Appellee*